**BRODSKY SMITH**
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9465 Wilshire Boulevard, Suite 300
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (310) 247-0160

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARILYN BAINTER,<br><br>Plaintiff,<br><br>vs.<br><br>THE DUCKHORN PORTFOLIO, INC., DEIRDRE MAHLAN, DAVE BURWICK, DANIEL COSTELLO, CHARLES ESSERMAN, MARSHALL FARRER, MICHELLE GLOECKLER, ADRIEL LARES, JAMES O'HARA, and TIM NALL,<br><br>Defendants. | **Case No.: 3:24-cv-8540**<br><br>**Complaint For:**<br><br>(1) Violation of § 14(a) of the Securities Exchange Act of 1934<br>(2) Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Sharilyn Bainter ("Plaintiff"), by and through her attorneys, alleges upon information and belief, except for those allegations that pertain to her, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1. Plaintiff brings this stockholder action against The Duckhorn Portfolio, Inc. ("Duckhorn" or the "Company") and the Company's Board of Directors (the "Board" or the

"Individual Defendants," collectively with the Company, the "Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a result of Defendants' efforts to sell the Company to Butterfly Equity LP ("Butterfly") as a result of an unfair process, and to enjoin an upcoming stockholder vote on a proposed all cash transaction (the "Proposed Transaction").

2.    The terms of the Proposed Transaction were memorialized in an October 7, 2024, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, Duckhorn stockholders will receive $11.10 per share in cash in a deal valued at approximately $1.95 billion.

3.    Thereafter, on November 21, 2024, the Company filed a Preliminary Proxy Statement on Form PREM14A with the SEC in support of the Proposed Transaction (the "Proxy Statement").

4.    The Proposed Transaction is unfair for a number of reasons. Significantly, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits. For example: (a) Company insiders own large illiquid blocks of Company stock which will be converted into merger consideration; (b) Company insiders own vested and unvested RSU awards, vested and unvested PSU awards, and other equity awards, all of which are subject to accelerated vesting and conversion into merger consideration; and (c) certain Company executives are entitled to severance packages, often referred to as "golden parachute" packages, entitling same to millions of dollars not shared by Plaintiff and other Company common stockholders.

5.    The Proxy Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed, and rational decision of whether to vote in favor of the Proposed Transaction and is thus in violation of the Exchange Act.  As detailed below, the Proxy Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial

projections for Duckhorn, provided by Duckhorn management to the Company Board, and the Board's financial advisor, J.P. Morgan Securities LLC ("JP Morgan"); and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinion created by JP Morgan if any, and provided to the Company.

6.    Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff.

## PARTIES

7.    Plaintiff is a citizen of Nevada, and at all times relevant hereto, has been a Duckhorn stockholder.

8.    Defendant Duckhorn produces and sells wines in North America. The Company is incorporated in Delaware and has its principal place of business at 1201 Dowdell Lane, Saint Helena, CA 94574. Shares of Duckhorn common stock are traded on the New York Stock Exchange ("NYSE") under the symbol "NAPA."

9.    Defendant Deirdre Mahlan ("Mahlan") has been Chairperson of the Company at all relevant times. In addition, Defendant Mahlan serves as the Company's President and Chief Executive Officer ("CEO").

10.    Defendant Dave Burwick ("Burwick") has been a director of the Company at all relevant times.

11.    Defendant Daniel Costello ("Costello") has been a director of the Company at all relevant times.

12.    Defendant Charles Esserman ("Esserman") has been a director of the Company at all relevant times.

13.    Defendant Marshall Farrer ("Farrer") has been a director of the Company at all relevant times.

14.    Defendant Michelle Gloeckler ("Gloeckler") has been a director of the Company at all relevant times.

15.    Defendant Adriel Lares ("Lares") has been a director of the Company at all relevant times.

16.    Defendant James O'Hara ("O'Hara") has been a director of the Company at all relevant times.

17.    Defendant Tim Nall ("Nall") has been a director of the Company at all relevant times.

18.    Defendants identified in ¶¶ 9 - 17 are collectively referred to as the "Individual Defendants."

19.    Non-Party Butterfly is a Los Angeles, California-based private equity firm that invests exclusively in the $26 trillion food sector.

<u>**JURISDICTION AND VENUE**</u>

20.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

21.    Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company maintains its headquarters in this District.

1

2

3                    **SUBSTANTIVE ALLEGATIONS**

4  ***Company Background***

5        23.     Duckhorn produces and sells wines in North America.

6        24.     In a press release on October 7, 2024, for the Fourth Quarter and Fiscal Year

7  2024 Financial Results, the Company highlighted its performance results and financial

8  success. For example: Net sales were $107.4 million, an increase of $7.3 million, or 7.3%,

9  versus the prior year; Adjusted EBITDA was $39.9 million, an increase of $5.7 million, or

10 16.7%, and Adjusted EBITDA margin improved by approximately 300 basis points versus

11 the prior year to a margin of 37.2%; Net sales were $405.5 million, an increase of $2.8

12 million, or 0.7%, versus the prior year; and Adjusted EBITDA was $155.1 million, an

13 increase of $10.6 million, or 7.3%, versus the prior year.

14       25.     Speaking on the results, Defendant CEO Mahlan stated, "We are pleased to

15 conclude fiscal 2024 with a solid fourth quarter performance."

16       26.     Defendant CEO Mahlan furthered that sentiment, "We meaningfully advanced our

17 strategic agenda in fiscal 2024, delivering strong operating and financial performance against a

18 dynamic backdrop, including the strategic acquisition of Sonoma-Cutrer. We believe the

19 successful integration of this marquee brand, coupled with the continuing execution against our

20 strategic initiatives positions the business for solid growth and profitability into fiscal 2025 and

21 beyond."

22       27.     These financial results are not an anomaly, but rather, are indicative of a trend of

23 continued success by Duckhorn. Based upon these positive results and outlook, the Company is

24 likely to have future success.

25       28.     Despite this upward trajectory, the Individual Defendants have caused Duckhorn to

26 enter into the Proposed Transaction without providing requisite information to Duckhorn

27 stockholders such as Plaintiff.

28

*The Flawed Sales Process*

29.    As detailed in the Proxy Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to effectuate a sale of the Company.

30.    The Proxy Statement is silent as to the nature of the confidentiality agreement entered into between the Company and Butterfly, whether this agreement differed from any other agreement with potentially interested third parties not specifically mentioned by the Proxy Statement, if so in all specific manners, including all specific terms of any such included "don't-ask, don't-waive" provisions or standstill provisions contained therein, including, all specific conditions, if any, under which such provisions would fall away.

31.    Further, the Proxy Statement fails to adequately disclose any and all of the communications regarding post-transaction employment during the negotiation of the underlying transaction which must be disclosed to stockholders.

32.    It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

*The Proposed Transaction*

33.    On October 7, 2024, Duckhorn and Butterfly issued a joint press release announcing the Proposed Transaction.  The press release stated, in relevant part:

> LOS ANGELES & ST. HELENA, Calif.--(BUSINESS WIRE)-- The Duckhorn Portfolio (NYSE: NAPA) ("Duckhorn" or the "Company"), North America's premier luxury wine company, and Butterfly Equity ("Butterfly"), a Los Angeles-based private equity firm specializing in the food and beverage sector, today announced that they have entered into a definitive agreement (the "Agreement") pursuant to which Duckhorn will be acquired by private equity funds managed by Butterfly in an all-cash transaction that values the Company at approximately $1.95 billion.
>
> Under the terms of the Agreement, Duckhorn stockholders will receive $11.10 per share in cash, representing a premium of approximately 65.3% to the volume weighted average share price of Duckhorn's common stock over the 90-day trading period ending on October 4, 2024. Following the completion of the transaction, Duckhorn will become a privately held company.

Duckhorn was established in 1976 and is a leading pure-play luxury wine producer in the United States with a curated portfolio of premium brands, including Duckhorn Vineyards, Decoy, Sonoma-Cutrer and Kosta Browne. Duckhorn wines are available to luxury consumers on five continents and in over 50 countries. Following the completion of the transaction, the Company will continue to be headquartered in St. Helena, California and will operate eleven winery brands under The Duckhorn Portfolio name.

"This announcement is excellent news for the future of our Company and for stockholders of The Duckhorn Portfolio, who will receive a substantial premium," said Deirdre Mahlan, Duckhorn President, Chief Executive Officer and Chairperson. "Based on our long history of success and innovation, and our position as one of America's most successful luxury wine companies, Butterfly believes strongly in The Duckhorn Portfolio and is fully invested in helping us achieve our next phase of growth. Just as important, Butterfly brings a proven track record of strengthening its portfolio companies while helping them advance their long-term strategic objectives. Through our partnership with Butterfly, we expect The Duckhorn Portfolio will have enhanced resources to build on our strong foundation and to further scale our operations. We are excited to work with the Butterfly team to begin writing an exciting new chapter in the story of The Duckhorn Portfolio."

Founded in 2016, Butterfly is a leading private equity firm dedicated to investing in the "seed-to-fork" food ecosystem in North America with a diverse portfolio including Milk Specialties Global, Chosen Foods, MaryRuth Organics, Orgain, Bolthouse Fresh Foods and QDOBA, among others. Through its deep sector experience, a disciplined and data-driven investment process, and an operations-driven approach to value creation, Butterfly seeks to partner with category-leading food and beverage businesses and deliver consistent investment returns for its investors.

"We are honored to partner with Duckhorn and welcome the Company to the Butterfly family," said Adam Waglay, Co-Founder and Co-CEO of Butterfly. "This is an incredible opportunity, and we look forward to bringing our specialized expertise and deep food and beverage network to bear to help amplify and accelerate the Company's mission to have their wine poured wherever fine wines are served throughout North America and the world."

"As a leading pure-play luxury wine producer, Duckhorn has, in our view, the best portfolio and strongest fundamentals in the industry," said Vishal Patel, Partner, Butterfly. "We believe the Company's curated suite of luxury wine brands, structurally advantaged business model, and world-class team have laid the foundation for a powerful, scalable platform, which will continue to drive growth both organically and through strategic acquisitions."

**Transaction Details**

The transaction, which was unanimously approved by the Duckhorn Board of Directors, is expected to close this winter, subject to customary closing conditions, including approval by Duckhorn stockholders and the receipt of required regulatory approvals. The completion of the transaction is not subject to a financing condition.

The Agreement includes a customary 45-day "go-shop" period expiring at 11:59 p.m. (Pacific time) on November 20, 2024. During this period, Duckhorn and its advisors will be permitted to solicit, consider and negotiate alternative acquisition proposals from third parties. The Duckhorn Board of Directors will have the right to terminate the Agreement and enter into a superior proposal, subject to the terms and conditions of the Agreement. There can be no assurance that this "go-shop" process will or will not result in a superior proposal, and Duckhorn does not intend to disclose related developments unless and until it determines that such disclosure is appropriate or otherwise required.

Stockholders currently representing a majority of the current outstanding voting power of the Duckhorn common stock have entered into voting agreements pursuant to which they have agreed, among other things, to vote certain of their shares of Company stock in favor of the transaction, subject to certain conditions. The voting support under the voting agreement ceases automatically if the merger agreement is terminated or if the Duckhorn Board of Directors makes an adverse recommendation change.

Upon completion of the transaction, Duckhorn's common stock will cease to trade and no longer be listed on the New York Stock Exchange.

***Potential Conflicts of Interest***

34.     The breakdown of the benefits of the deal indicates that Duckhorn insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of Duckhorn.

35.     Company insiders, currently own large, illiquid portions of Company stock all of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company as follows:

| Name of Executive Officer or Director | Number of Shares of Company Common Stock (#) | Cash Consideration for Company Common Stock ($) |
|---|---|---|
| Deirdre Mahlan | 92,544 | $ 1,027,238.40 |
| Alex Ryan[1] | 1,731,628 | $ 19,221,070.80 |
| Gayle Bartscherer[2] | 80,383 | $ 892,251.30 |
| Jennifer Fall Jung | 48,899 | $ 542,778.90 |
| Sean Sullivan | 119,774 | $ 1,329,491.40 |
| Pete Przybylinski | 381,036 | $ 4,229,449.60 |
| Zach Rasmuson | 453,105 | $ 5,029,465.50 |
| Charles Esserman | — | — |
| Michelle Gloeckler | 29,374 | $ 326,051.40 |
| Daniel Costello | — | — |
| Adriel Lares | 25,554 | $ 283,649.40 |
| James O'Hara | — | — |
| Marshall Farrer | — | — |
| Tim Nall | — | — |
| Dave Burwick | — | — |
| Melanie Cox[3] | 31,957 | $ 354,722.70 |

36.    Additionally, Company insiders currently own large amounts of vested and unvested RSU Awards, vested and unvested PSU Awards, and other equity awards, some of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company as follows:

| Name of Executive Officer or Director | Vested Company Stock Options (#)[1] | Cash Consideration for Vested Company Stock Options ($) | Company Stock Options Expected to Accelerate (#)[2] | Cash Consideration for Accelerated Company Stock Options ($) | Unvested Company Stock Options (#)[3] | Cash Consideration for Unvested Company Stock Options ($)[4] | Total Cash Consideration for Company Stock Options in the Merger ($) |
|---|---|---|---|---|---|---|---|
| Deirdre Mahlan | — | | — | | — | | — |
| Jennifer Fall Jung | 40,266 | 40,908 | — | — | 244,200 | 142,470 | 183,378 |
| Sean Sullivan | 173,162 | 37,499 | 34,315 | — | 245,845 | 130,597 | 168,096 |
| Pete Przybylinski | 173,162 | 37,499 | 34,315 | — | 245,845 | 130,597 | 168,096 |
| Zach Rasmuson | 173,162 | 37,499 | 34,315 | — | 245,845 | 130,597 | 168,096 |

| Name of Executive Officer or Director | Number of Unvested Company RSUs and Company PSUs Expected to Accelerate (#)[1] | Cash Consideration for Accelerated Company RSUs and Company PSUs ($) | Number of Unvested Company RSUs (#)[2] | Cash Consideration for Unvested Company RSUs ($)[3] | Total Cash Consideration for Unvested Company PSUs and Company RSUs in the Merger ($) |
|---|---|---|---|---|---|
| Deirdre Mahlan | 531,286 | 5,897,275 | — | — | 5,897,275 |
| Jennifer Fall Jung | — | — | 81,401 | 903,551 | 903,551 |
| Sean Sullivan | 11,441 | 126,995 | 81,950 | 909,645 | 1,036,640 |

COMPLAINT

| Pete Przybylinski | 11,441 | 126,995 | 81,950 | 909,645 | 1,036,640 |
|---|---|---|---|---|---|
| Zach Rasmuson | 11,441 | 126,995 | 81,950 | 909,645 | 1,036,640 |
| Alex Ryan[4] | — | — | — | — | — |
| Gayle Bartscherer[5] | — | — | — | — | — |
| Charles Esserman | — | — | — | — | — |
| Michelle Gloeckler | 12,775 | 141,803 | — | — | 141,803 |
| Daniel Costello | — | — | — | — | — |
| Adriel Lares | 12,775 | 141,803 | — | — | 141,803 |
| James O'Hara | — | — | — | — | — |
| Marshall Farrer | — | — | — | — | — |
| Tim Nall | — | — | — | — | — |
| Dave Burwick | 9,011 | 100,022 | — | — | 100,022 |
| Melanie Cox[6] | — | — | — | — | — |

37.    Moreover, certain employment agreements with certain Duckhorn executives entitle such executives to severance packages, should their employment be terminated under certain circumstances. These 'golden parachute' packages are significant, and will grant several directors or officers entitled to them millions of dollars, compensation not shared by Plaintiff and will be paid out as follows:

| Name[1] | Cash ($)[2] | Equity ($)[3] | Pension / NQDC ($)[4] | Perquisites/ Benefits ($)[5] | Total ($) |
|---|---|---|---|---|---|
| Deirdre Mahlan | 721,000 | 5,897,275 | 20,283 | 3,600 | 6,642,158 |
| Jennifer Fall Jung | 525,000 | 1,046,021 | 20,173 | 17,532 | 1,608,726 |
| Sean Sullivan | 422,000 | 1,167,237 | 95,101 | 5,784 | 1,690,122 |
| Pete Przybylinski | 410,000 | 1,167,237 | 93,218 | 15,804 | 1,686,259 |
| Zach Rasmuson | 410,000 | 1,167,237 | 98,027 | 15,804 | 1,691,068 |

38.    The Proxy Statement fails to adequately all communications regarding post-transaction employment during the negotiation of the underlying transaction. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for Plaintiff to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

39.    Thus, while the Proposed Transaction is not in the best interests of Duckhorn, Plaintiff, or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Proxy Statement***

40. The Duckhorn Board caused to be filed with the SEC a materially misleading and incomplete Proxy Statement that, in violation the Exchange Act, fails to provide Plaintiff in her capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

41. The Proxy Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction. In particular, the Proxy Statement fails to disclose:

    a. Whether the confidentiality agreements entered into by the Company with Butterfly differed from any other unnamed confidentiality agreement entered into between the Company and an interested third parties;

    b. All specific conditions under which any standstill provision contained in any confidentiality agreement entered into between the Company and potentially interested third parties throughout the sales process, including Boeing, would fall away; and

    c. Adequately disclose any and all of the communications regarding post-transaction employment during the negotiation of the underlying transaction which must be disclosed to stockholders.

*Omissions and/or Material Misrepresentations Concerning Duckhorn Financial Projections*

42. The Proxy Statement fails to provide material information concerning financial projections for Duckhorn provided by Duckhorn management to the Company Board and JP Morgan and relied upon by JP Morgan in its analyses. The Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading.

43.     Notably, the Proxy Statement reveals that as part of its analyses, JP Morgan reviewed: "certain internal financial analyses and forecasts prepared by the management of the Company relating to its business, as discussed more fully below in the section entitled '—Certain Unaudited Prospective Financial Information.'"

44.     The Proxy Statement should have, but fails to provide, certain information in the projections that Duckhorn management provided to the Company Board and JP Morgan.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

45.     With regard to the "*Case A" Projections*, the Proxy Statement fails to disclose:

    a.  Net Sales, including the inputs, metrics, and assumptions used to determine same;

    b.  Cost of Goods Sold, including the inputs, metrics, and assumptions used to determine same;

    c.  Gross Profit, including the inputs, metrics, and assumptions used to determine same;

    d.  Operating Expenses, including the inputs, metrics, and assumptions used to determine same;

    e.  EBIT, including the inputs, metrics, and assumptions used to determine same;

    f.  Depreciation and Amortization, including the inputs, metrics, and assumptions used to determine same;

    g.  Other Adjustments, including the inputs, metrics, and assumptions used to determine same;

    h.  Adjusted EBITDA, including the inputs, metrics, and assumptions used to determine same;

COMPLAINT

i.   Capital Expenditures, including the inputs, metrics, and assumptions used to determine same;

j.   Change in Net Working Capital, including the inputs, metrics, and assumptions used to determine same; and

k.   Unlevered Free Cash Flow, including the inputs, metrics, and assumptions used to determine same.

46.      With regard to the "*Case B" Projections*, the Proxy Statement fails to disclose:

a.   Net Sales, including the inputs, metrics, and assumptions used to determine same;

b.   Cost of Goods Sold, including the inputs, metrics, and assumptions used to determine same;

c.   Gross Profit, including the inputs, metrics, and assumptions used to determine same;

d.   Operating Expenses, including the inputs, metrics, and assumptions used to determine same;

e.   EBIT, including the inputs, metrics, and assumptions used to determine same;

f.   Depreciation and Amortization, including the inputs, metrics, and assumptions used to determine same;

g.   Other Adjustments, including the inputs, metrics, and assumptions used to determine same;

h.   Adjusted EBITDA, including the inputs, metrics, and assumptions used to determine same;

i.   Capital Expenditures, including the inputs, metrics, and assumptions used to determine same;

j.   Change in Net Working Capital, including the inputs, metrics, and assumptions used to determine same; and

COMPLAINT

k.  Unlevered Free Cash Flow, including the inputs, metrics, and assumptions used to determine same.

47.  With regard to the "*Case C" Projections*, the Proxy Statement fails to disclose:

a.  Net Sales, including the inputs, metrics, and assumptions used to determine same;

b.  Cost of Goods Sold, including the inputs, metrics, and assumptions used to determine same;

c.  Gross Profit, including the inputs, metrics, and assumptions used to determine same;

d.  Operating Expenses, including the inputs, metrics, and assumptions used to determine same;

e.  EBIT, including the inputs, metrics, and assumptions used to determine same;

f.  Depreciation and Amortization, including the inputs, metrics, and assumptions used to determine same;

g.  Other Adjustments, including the inputs, metrics, and assumptions used to determine same;

h.  Adjusted EBITDA, including the inputs, metrics, and assumptions used to determine same;

i.  Capital Expenditures, including the inputs, metrics, and assumptions used to determine same;

j.  Change in Net Working Capital, including the inputs, metrics, and assumptions used to determine same; and

k.  .Unlevered Free Cash Flow, including the inputs, metrics, and assumptions used to determine same.

48.  With regard to the "*Case D" Projections*, the Proxy Statement fails to disclose:

a.  Net Sales, including the inputs, metrics, and assumptions used to determine same;

COMPLAINT

b.  Cost of Goods Sold, including the inputs, metrics, and assumptions used to determine same;

c.  Gross Profit, including the inputs, metrics, and assumptions used to determine same;

d.  Operating Expenses, including the inputs, metrics, and assumptions used to determine same;

e.  EBIT, including the inputs, metrics, and assumptions used to determine same;

f.  Depreciation and Amortization, including the inputs, metrics, and assumptions used to determine same;

g.  Other Adjustments, including the inputs, metrics, and assumptions used to determine same;

h.  Adjusted EBITDA, including the inputs, metrics, and assumptions used to determine same;

i.  Capital Expenditures, including the inputs, metrics, and assumptions used to determine same;

j.  Change in Net Working Capital, including the inputs, metrics, and assumptions used to determine same; and

k.  Unlevered Free Cash Flow, including the inputs, metrics, and assumptions used to determine same.

49.    With regard to the "*Case E" Projections*, the Proxy Statement fails to disclose:

a.  Net Sales, including the inputs, metrics, and assumptions used to determine same;

b.  Cost of Goods Sold, including the inputs, metrics, and assumptions used to determine same;

c.  Gross Profit, including the inputs, metrics, and assumptions used to determine same;

COMPLAINT

    d.  Operating Expenses, including the inputs, metrics, and assumptions used to determine same;

    e.  EBIT, including the inputs, metrics, and assumptions used to determine same;

    f.  Depreciation and Amortization, including the inputs, metrics, and assumptions used to determine same;

    g.  Other Adjustments, including the inputs, metrics, and assumptions used to determine same;

    h.  Adjusted EBITDA, including the inputs, metrics, and assumptions used to determine same;

    i.  Capital Expenditures, including the inputs, metrics, and assumptions used to determine same;

    j.  Change in Net Working Capital, including the inputs, metrics, and assumptions used to determine same; and

    k.  Unlevered Free Cash Flow, including the inputs, metrics, and assumptions used to determine same.

50.    With regard to the "*Case F" Projections*, the Proxy Statement fails to disclose:

    a.  Net Sales, including the inputs, metrics, and assumptions used to determine same;

    b.  Cost of Goods Sold, including the inputs, metrics, and assumptions used to determine same;

    c.  Gross Profit, including the inputs, metrics, and assumptions used to determine same;

    d.  Operating Expenses, including the inputs, metrics, and assumptions used to determine same;

    e.  EBIT, including the inputs, metrics, and assumptions used to determine same;

    f.  Depreciation and Amortization, including the inputs, metrics, and assumptions used to determine same;

g.  Other Adjustments, including the inputs, metrics, and assumptions used to determine same;

h.  Adjusted EBITDA, including the inputs, metrics, and assumptions used to determine same;

i.  Capital Expenditures, including the inputs, metrics, and assumptions used to determine same;

j.  Change in Net Working Capital, including the inputs, metrics, and assumptions used to determine same; and

k.  Unlevered Free Cash Flow, including the inputs, metrics, and assumptions used to determine same.

51.    The Proxy Statement also fails to disclose a reconciliation of all non-GAAP to GAAP metrics utilized in the projections.

52.    This information is necessary to provide Plaintiff, in her capacity as a Company stockholder, with a complete and accurate picture of the sales process and its fairness. Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

53.    Without accurate projection data presented in the Proxy Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of the JP Morgan's financial analyses, or make an informed decision whether to vote her shares in favor of the Proposed Transaction.   As such, the Board has violated the Exchange Act by failing to include such information in the Proxy Statement.

_Omissions and/or Material Misrepresentations Concerning the Financial Analyses by JP Morgan_

54.    In the Proxy Statement, JP Morgan describes its fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations

or evaluate the fairness opinions.

55.    With respect to the *Public Trading Multiples Analysis*, the Proxy Statement fails to disclose:

      a.    The firm value ("FV") for each of the selected companies analyzed;

      b.    The 2025 Adjusted EBITDA for each of the selected companies analyzed;

      c.    The FV/ 2025 Adjusted EBITDA for each of the selected companies analyzed; and

      d.    The inputs, metrics, and assumptions used to determine the FV/ 2025 Adjusted EBITDA Multiple reference range of 6.0x to 12.0x utilized.

56.    With respect to the *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose:

      a.    The inputs, metrics, and assumptions used to determine the perpetuity growth rates ranging from 2.0% to 3.0% utilized;

      b.    The inputs, metrics, and assumptions used to determine the discount rates of 7.25% to 8.25% utilized; and

      c.    The Company's weighted average cost of capital utilized.

57.    These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

58.    Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes her value and serves her interest as a stockholder. Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in her best interests as a public Duckhorn stockholder.  As such, the Board has violated the Exchange Act by failing to include such information in the Proxy Statement.

**FIRST COUNT**

**Violations of Section 14(a) of the Exchange Act**

**(Against All Defendants)**

59.     Plaintiff repeats all previous allegations as if set forth in full herein.

60.     Defendants have disseminated the Proxy Statement with the intention of soliciting stockholders, including Plaintiff, to vote in favor of the Proposed Transaction.

61.     Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

62.     As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

63.     The Proxy Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that

the Proxy Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

64.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

65.    The Individual Defendants were at least negligent in filing a Proxy Statement that was materially misleading and/or omitted material facts necessary to make the Proxy Statement not misleading.

66.    The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of her entitlement to decide whether to vote her shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

**SECOND COUNT**

**Violations of Section 20(a) of the Exchange Act**

**(Against all Individual Defendants)**

67.    Plaintiff repeats all previous allegations as if set forth in full herein.

68.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Proxy Statement was materially misleading to Plaintiff in her capacity as a Company stockholder.

69.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Proxy Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual

Defendants were able to, and did, control the contents of the Proxy Statement.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Proxy Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

70.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Duckhorn's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Proxy Statement was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the Proxy Statement and are therefore responsible and liable for the misrepresentations contained herein.

71.    The Individual Defendants acted as controlling persons of Duckhorn within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Duckhorn to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Duckhorn and all of its employees.  As alleged above, Duckhorn is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in her favor and against the Defendants, as follows:

A.    Enjoining the Proposed Transaction;

B.    In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C.    Directing the Individual Defendants to exercise their fiduciary duties to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein

not misleading;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: November 27, 2024                    **BRODSKY SMITH**

                                  By: *Evan J. Smith*
                                  Evan J. Smith, Esquire (SBN 242352)
                                  esmith@brodskysmith.com
                                  Ryan P. Cardona, Esquire (SBN 302113)
                                  rcardona@brodskysmith.com
                                  9465 Wilshire Blvd., Ste. 300
                                  Phone: (877) 534-2590
                                  Facsimile (310) 247-0160

                                  *Attorneys for Plaintiff*